**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| RANDALL CULLER, Individually and On Behalf of All Other Similarly Situated Individuals, | |
| *Plaintiff,* | Case No. 9:23-cv-5719-BHH |
| v. | CLASS ACTION COMPLAINT |
| NISSAN NORTH AMERICA, INC., | JURY TRIAL DEMANDED |
| *Defendant.* | |

## **CLASS ACTION COMPLAINT**

1.  Plaintiff Randall Culler ("Plaintiff" or "Mr. Culler") brings this class action lawsuit, on behalf of himself and all other similarly situated individuals, against Defendant, Nissan North America, Inc. ("Defendant" or "Nissan") to redress the harms caused by Defendant for material defects in the primer coating its motor vehicles.

2.  Primer is a preparatory coating put on materials before painting which ensures better adhesion of paint to the surface, increases paint durability, and provides additional protection for the material being painted.[1]

3.  A material defect in the primer of the vehicles manufactured and/or sold by Defendant under the Nissan brand name from at least 2017 through the present, has resulted in the substantial devaluation of the vehicles purchased by Plaintiff and other similarly situated individuals, and thus monetary loss to purchasers of Defendant's vehicles.

---

[1] https://www.autobodytoolmart.com/automotive-primers (last accessed Oct. 17, 2023).

4.   Despite having been aware of its vehicles' defective primer, Defendant has refrained from disclosing the defect to its customers and has outright declined to repair the defect free of charge.

5.   Plaintiff makes these allegations on personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including as to investigations conducted by his attorneys.

## JURISDICTION AND VENUE

6.   The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because (a) at least one member of the putative class is a citizen of a State different from Defendant; (b) the amount in controversy exceeds $5 million, exclusive of interests and costs; and (c) none of the Class Action Fairness Act's ("CAFA") exceptions apply.

7.   Defendant is subject to the Court's personal jurisdiction because it has purposefully availed itself of the privilege of doing business within the State of South Carolina, including within this district and division; it has had continuous and systematic general business contacts within the state, including within this district and division; and it can be said to have reasonably anticipated being hailed into court in this forum.

8.   Defendant maintains a registered agent for service of process in South Carolina.

9.   Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. Defendant caused the vehicles at issue to be offered for sale and sold to the public, including Plaintiff, in this district and division. Plaintiff was exposed to Defendant's conduct within this district and division. Plaintiff also bought his Nissan vehicle within this judicial District.

10. Venue is also proper under 28 U.S.C. § 1391(c)(2) because Defendant is subject to the Court's personal jurisdiction with respect to this matter.

## PARTIES

11. Mr. Culler is a resident of and is domiciled in Okatie, South Carolina, within this judicial District.

12. Defendant, Nissan North America, Inc.*, is a Delaware corporation with its principal place of business in Franklin, Tennessee.

13. Defendant styles, engineers, finances, sells, markets, distributes, and manufactures Nissan and Infinity branded vehicles within the United States and this District.[2]

## FACTUAL ALLEGATIONS

14. In 2022, Defendant was estimated as being the twelfth (12th) largest car company based on annual revenue.[3]

15. That year, Defendant sold a total of 729,350 vehicles in the United States, of which 682,731 from its Nissan Division.[4] Indeed, this was a substantial decline in Defendant's sales from previous

---

[2]         https://usa.nissannews.com/en-US/releases/nissan-announces-u-s-pricing-for-2017-frontier?selectedTabId=releases (last accessed Aug. 3, 2023) (describing Defendant's operations in North America under the "About Nissan North America" heading).
[3]         https://www.yahoo.com/now/16-biggest-car-companies-sales-051951047.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAJHerPN5eKSkjRqJyPqswIjR6WpKPYo8kc0xkFFlxZV7lRPbidFWBLnUgRYfpRtLl_Eg9XmVRbafeRCnW1yf8MkeV5vyzP1Hhc_mXppQVgdZ5rLIlw0IZuCefDHbsX0CUCAF0NG5y0qG3P9CrTGI3AQjHICpIYJqxroj12F4Cb6W (last accessed Aug. 3, 2023).
[4]         https://usa.nissannews.com/en-US/releases/release-11a3798e690982990d7a74e66d13fa78-nissan-group-reports-2022-fourth-quarter-and-2022-calendar-year-us-sales?selectedTabId=releases (last accessed Aug. 3, 2023).

years, as Defendant sold a total of 977,639 vehicles, of which 919,086 were from its Nissan Division, in 2021, and 899,217 vehicles, of which 819,715 were from its Nissan Division, in 2020.[5]

16.  Indeed, in 2017 and 2018 (the years in which Plaintiff's Vehicle was manufactured and sold), Defendant reported selling between 1,344,597 and 1,440,049 vehicles in the United States through its Nissan Division alone.[6]

17. In reaching the above sales figures, Defendant has marketed its vehicles by telling consumers to "forget cookie cutter body shapes, **washed out colors**, and predictable styling. From first concept to your driveway, every Nissan is designed to innovate, excite, and especially, thrill."[7]

18. This message has remained relatively consistent through the years. For instance, in 2018, Defendant's motto was "INNOVATION AND EXCITEMENT FOR EVERYONE" which, for Defendant, meant "making cars that are more efficient, **more beautiful**, more inspiring and more human than ever before."[8] Defendant had the same motto in 2017.[9]

19. For certified pre-owned vehicles, such as the one purchased by Plaintiff, Defendant harps on the fact that "[a]ll Nissan Certified Vehicles must pass a 167-point comprehensive inspection . . . by a Nissan-trained technician" and that "[o]nly upon completion of this rigorous inspection

---

[5]    https://usa.nissannews.com/en-US/releases/release-45822a26abbf59dfdcc394eac91f947d-nissan-group-reports-2021-fourth-quarter-and-2021-calendar-year-us-sales?selectedTabId=releases (last accessed Aug. 3, 2023).

[6]    https://usa.nissannews.com/en-US/releases/release-ff38a0c7224a41cdae89d786a02fbd82-nissan-group-reports-december-2018-and-2018-calendar-year-u-s-sales?selectedTabId=releases (last accessed Aug. 3, 2023).

[7] https://www.nissanusa.com/thrill/design.html (last accessed Aug. 3, 2023).

[8] https://web.archive.org/web/20180104003335/https://www.nissanusa.com/about.html?next=footer.about.link     (last     accessed     Aug.     3,     2023)     (showing https://www.nissanusa.com/about.html?next=footer.about.link from Jan. 4, 2018).

[9] https://web.archive.org/web/20170303012419/https://www.nissanusa.com/about.html?next=footer.about.link (last accessed Aug. 3, 2023) (same, but for Mar. 3, 2023).

process can it be labeled a Nissan Certified Pre-Owned vehicle."[10] And as part of this comprehensive inspection, Defendant's trained technicians are required to inspect a vehicle's "Overall Paint Condition."[11]

20. In fact, as early as 2016, Defendant advertised its inspection of certified pre-owned vehicles by telling customers that "IF YOUR DOCTOR GAVE A CHECKUP THIS THOROUGH, WE MIGHT PUT A WARRANTY ON YOU, TOO."[12] And, as early as 2015, Defendant's certified pre-owned inspection checklist has required Defendant's trained technicians to inspect a vehicle's "Overall Paint Condition" before a vehicle could be sold as being certified pre-owned.[13]

21. On May 7, 2018, Plaintiff purchased a certified pre-owned white Nissan Frontier SL (VIN ending in 700649) (the "Vehicle") from Vaden Nissan of Hilton Head, located at 200 Fording Island Rd., Bluffton, South Carolina 29910 (Dealer Number 5523) (hereinafter, "Vaden Nissan"). At the time of purchase, the Vehicle only had 9,179 miles on its odometer.

---

[10]  https://www.nissanusa.com/shopping-tools/certified-pre-owned.html (last accessed Aug. 3, 2023).

[11] https://www.nissanusa.com/content/dam/Nissan/us/shopping-tools/certified-pre-owned/167%20CPO%20Checklist.pdf (last accessed Aug. 3, 2023).

[12] https://web.archive.org/web/20160822125011/http://cpo.nissanusa.com/about-certified-inspection?next=cpo.overview.about.carousel.inspection (last accessed Aug. 3, 2023) (showing http://cpo.nissanusa.com/about-certified-inspection?next=cpo.overview.about.carousel.inspection from Aug. 22, 2016). The messaging was the same in 2017. *See* https://web.archive.org/web/20170630041115/http://cpo.nissanusa.com/certified-pre-owned (showing http://cpo.nissanusa.com/certified-pre-owned from June 30, 2017).

[13] https://web.archive.org/web/20150906021049/http://cpo.nissanusa.com/download/?03-24-14_n_14cpo_inspection_checklist.pdf (last accessed Aug. 3, 2023) (showing http://cpo.nissanusa.com/download/?03-24-14_n_14cpo_inspection_checklist.pdf from Sept. 6, 2015). This was the same in 2017. *See* https://web.archive.org/web/20170118175947/http://cpo.nissanusa.com/download/?03-24-14_n_14cpo_inspection_checklist.pdf (showing http://cpo.nissanusa.com/download/?03-24-14_n_14cpo_inspection_checklist.pdf from Jan. 18, 2017).

22. At the time of purchase, the Vehicle was marketed and sold with all of the aforementioned guarantees, including Defendant's representations as to the "comprehensive" inspection of its pre-owned vehicles.

23. Therefore, as a purchaser of one of Defendant's vehicles, Plaintiff had a reasonable expectation that the primer on his vehicle would be durable enough to withstand his day-to-day driving absent *force majeure*. Plaintiff personally expected the primer on his vehicle to last much longer than the six-plus (6+) years the vehicle has been in operation.

24. In the Winter of 2022, Plaintiff washed his Vehicle by hand and noticed two (2) spots of missing paint, each approximately one (1) inch in diameter, on his Vehicle.

25. Then, in the Spring of 2023, Plaintiff washed his Vehicle again, but this time, he noticed several additional spots of paint which came off as he rinsed his Vehicle with a regular water hose (i.e., with no pressure washing function).

26. Concerned about the paint on his Vehicle, Plaintiff visited the No Limit Auto Body shop (hereinafter, "No Limit") in Bluffton, South Carolina.

27. At No Limit, Plaintiff was informed that the issues he was experiencing with the Vehicle was pervasive among white vehicles and that the paint job on the Vehicle was so weak that the mechanics at No Limit would not be able to tape off an area to paint the part of the Vehicle that was peeling because the tape would cause more peeling to occur.[14] As a result, No Limit suggested just repainting and repriming the hood of the Vehicle for approximately $700.00 since the hood was a separate removable component of the Vehicle, and taping off other portions of the Vehicle would cause more paint to peel off.

---

[14] Notably, however, both white and black paint has peeled off Plaintiff's Vehicle as a result of the defective primer as of September 14, 2023.

28. Wanting to check his options with Defendant, Plaintiff called Defendant's customer service line and spoke to one of Defendant's agents named David.

29. While speaking with a representative identified as David, Plaintiff was informed that, under some circumstances, Defendant would cover repairs after the warranty period.

30. David then checked the Vehicle's mileage and sale date using the Vehicle's VIN and gave Plaintiff the impression that the Vehicle was still covered by warranty. David then told Plaintiff to visit the nearest Nissan dealership (i.e., Vaden Nissan), which would either inspect the paint job for manufacturer's defects or send Plaintiff to a certified repair shop, which would do the same.

31. Plaintiff subsequently visited Vaden Nissan, which made an appointment for Plaintiff at Advanced Body Shops, Vadden Nissan's certified body shop.

32. At Advanced Body Shops, Plaintiff was informed that the only way to address the problems Plaintiff had experienced with his Vehicle's primer was to completely reprime and repaint the Vehicle because the Vehicle was covered with less primer and paint than Vehicles of other colors. Particularly, Advanced Body Shops explained to Plaintiff that the problems he had been experiencing were predominantly affecting Defendant's white vehicles, which use less paint and primer and were therefore more susceptible to peeling.[15]

33. After visiting Advanced Body Shops, Plaintiff visited Vadden Nissan with the estimates for the new paint job (i.e., including primer) to his Vehicle.

34. The service manager at Vaden Nissan confirmed that it was possible that Defendant would cover the costs of the new paint job. The service manager also opined that the factory paint job

---

[15] Indeed, in providing Plaintiff with a preliminary estimate of the work that needed to be done on the Vehicle, Advanced Body Shops indicated that "[i]t's definitely a delamination issue from OEM Primer" and that the "Vehicle has factory OEM paint peeling from OEM primer[.]" According to the same estimate "OEM" means "Original Equipment Manufacturer."

looked defective to him and that it was the owner's rather than the dealership's responsibility to contact Defendant regarding the defect.

35. Thereafter, Plaintiff called Nissan's customer service line once more and explained that he had taken all the steps outlined by the representative (David) on his previous call. In response, the agent on the customer service line told Plaintiff that he would forward the information Plaintiff provided to the next level of customer service and that he would hear back from someone in one (1) to three (3) business days.

36. On or about March 31, 2023, Plaintiff received a call from another one of Defendant's agents identified as Trelani, who informed Plaintiff that Defendant would not cover the repairs to his Vehicle. In response, Plaintiff asked to speak to a supervisor and was informed that a supervisor would call in one (1) to two (2) business days.

37. A few days later, Plaintiff received a call from Nathaniel, who upon information and belief, was Trelani's supervisor, from the phone number (615) 725-7810. Like Trelani, Nathaniel informed Plaintiff that Defendant would not cover the repairs to his Vehicle.

38. Despite having gone through the process outlined by Defendant to repair his Vehicle, Plaintiff is still left without any meaningful redress from Defendant.

39. That said, a factory paint job should last at least 10 to 15 years, as long as a vehicle is on the road.[16] But the paint job on Plaintiff's Vehicle started peeling in roughly half the minimum

---

[16] https://www.nbclosangeles.com/news/new-car-owner-discovers-paint-problem/110015/ (last accessed Aug. 3, 2023) (standing for proposition that factory paint job should last forever); https://www.badellscollision.com/blog/5-facts-consider-getting-car-painted/#:~:text=for%20your%20vehicle.-,Car%20Paint%20Doesn't%20Last%20Forever,every%20five%20to%20ten%20years. (last accessed Aug. 3, 2023) (standing for proposition that paint lasts 10-15 years).

amount of time estimated for the durability of factory paint jobs given the defective primer coating the Vehicle.

40. Defendant has been keenly aware of the issue affecting the paint on its vehicles for several years. The issue Plaintiff has been experiencing with his Vehicle is not the first time Defendant has faced criticism for the paint used on its vehicles. For instance, in 2020, the National Highway Traffic Safety Administration ("NHTSA") issued a Quality Action Campaign Bulletin for a similar issue affecting 5,528 white 2013 Nissan Rogue vehicles as a result of a class action settlement.[17]

41. In 2015, NBC Los Angeles reported a California woman who purchased a blue 2012 Nissan Frontier and witnessed the paint on her brand-new vehicle "bubbling and peeling before her eyes."[18]

42. Forums, such as Nissanclub.com, show countless posts from drivers of Nissan-branded vehicles complaining about the paint on their vehicles starting to peel.[19]

43. Similarly, on Facebook, there is an entire page entirely dedicated to the "Nissan Frontier Peeling Paint Defect," with drivers sharing several pictures of their Nissan-branded vehicles with flaking/peeling paint.[20] Some of the several posts on the Facebook page are shown below:

---

[17] https://static.nhtsa.gov/odi/tsbs/2020/MC-10171237-0001.pdf (last accessed Aug. 3, 2023).
[18] *See*, *supra*, n.13.
[19] https://www.nissanclub.com/threads/paint-peeling.519928/ (last accessed Aug. 3, 2023) (several posts from Nissan drivers complaining about the paint on different Nissan models); https://www.cargurus.com/Cars/Discussion-t56729_ds883888 (last accessed Aug. 3, 2023) (showing posts about similar complaints and inconsistent responses from Defendant).
[20] https://www.facebook.com/groups/frontierpaintdefect/ (last accessed Aug. 24, 2023).



June 25 ·

Another frontier peeling. My mom bought this in 2019, it's a 2018 midnight edition and how horrible for this to happen. They had a 2002 frontier previously and never had paint issues. Will look into starting a class action and see what that takes. She's located in Florida.

July 17 ·

My 2017 Nissan Frontier. Purchased new off the lot in November 2017 and started peeling a little on the door next to the windows within the first year (rusted spots) and it has progressively gotten worse on the doors and now on the front fenders in the same place on both sides. I got pretty fired up when I ran across this FB page and saw the profile picture of a white Nissan Frontier just like mine with the same peeling in the same spot. If this was a 20 year old truck I coul... See more

+4

July 11 ·

2018 Nissan Frontier.  Paint is peeling more and more everyday.

Anonymous participant
July 13 ·

Both sides

44. Additionally, Defendant has faced lawsuits in the past concerning similar paint-peeling issues for Nissan Rogue and INFINITI QX56 vehicles[21]—yet, the issues of paint prematurely peeling off its vehicles as a result of defective primer continues to plague drivers such as Plaintiff.

45. In short, the premature peeling of paint on Nissan-branded vehicles is a pervasive issue that has been around for a long time and has affected numerous drivers of Nissan vehicles, including Plaintiff.

46. The primer Defendant uses on its vehicles, including Plaintiff's Vehicle, has not conformed to industry standards, as evidenced by the fact that the paint on Plaintiff's Vehicle has deteriorated in roughly half the minimum amount of time estimated for the durability of factory paint jobs given the defective primer.

47. The durability of the Vehicle's factory paint job formed part of the basis of the bargain for Plaintiff's purchase of the Vehicle.

48. Plaintiff would not have purchased his Vehicle or would have paid significantly less for his Vehicle had he been aware of the defective nature of the Vehicle's primer, which resulted in significant peeling a few years after purchase.

## TOLLING OF THE STATUTE OF LIMITATONS

49. Plaintiff and other Class Members[22] were not aware of the material defect in the primer coating Nissan vehicles, including Defendant's omissions and concealment alleged herein of facts sufficient to place them on inquiry notice of the such defects.

---

[21] *See Nelson v. Nissan North America, Inc.*, No. 3:17-cv-1114 (M.D. Tenn.) (class action case involving defective paint in Infiniti-branded vehicles, which are manufactured and sold by Defendant); *Anglin v. Nissan North America, Inc.*, No. 1:17-cv-04240 (N.D. Ill.) (class action case involving defective paint in Infiniti-branded vehicles, which are manufactured and sold by Defendant).

[22] For definition, *see, infra,* n.21.

50. Plaintiff first learned of the defective primer on his Vehicle in approximately the Winter of 2022 after having cleaned his Vehicle and then seeing paint peeling from his Vehicle. Before that time, Plaintiff had no reason to suspect that the peeling paint on his Vehicle was the result of an undisclosed defect in the primer used by Nissan to coat Class Vehicles.

51. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the fact that Defendant had manufactured and sold the Class Vehicles[23] with defective primer. The limited, though probative, disclosures and revelations alleged herein required extensive investigation by counsel who suspected, and then became fully aware of, the defective primer on the Class Vehicles.

52. Defendant and its suppliers maintain exclusive control over its proprietary materials containing the formulas and/or chemical composition of the defective primer used in coating the Class Vehicles. Such proprietary materials would have revealed the existence and nature of the defect and the ways in which it manifests in the Class Vehicles. Plaintiff and Class Members do not have access to those materials, and even if they did, they would not likely be able to interpret said materials in discerning the defective primer used on their Class Vehicles. As such Plaintiff and Class Members could not reasonably have been expected to discover the defect absent their own experiences with the Class Vehicles.

53. Accordingly, the statute of limitations did not begin to run from the date of purchase because Plaintiff and other Class Members did not discover or could not have discovered their claims until the primer started to deteriorate and the paint started to peel off their Class Vehicles at a later date.

---

[23] *Ibid.*

54. Alternatively, fraudulent concealment tolls the statute of limitations because Plaintiff and Class Members were unaware of the defect when they purchased their Class Vehicles. They did not learn of the defect until the paint started peeling of their Class Vehicles. Before that time, they had no reason to suspect that the primer on their Class Vehicles was defective.

55. Defendant's violations were carried out in a way that precluded detection of the violations and the existence and scope of the defect.

56. Typically, a vehicle's factory paint job is supposed to last at least 10 to 15 years.[24] Plaintiff and Class Members thus reasonably expected the Class Vehicles' primer to be more durable than it actually was and to not prematurely deteriorate and cause the Class Vehicles' paint to peel.

57. A reasonable person under the circumstances presented in this case would have no cause to investigate the Defendant's conduct before or after purchasing a Class Vehicle and would have faced extreme difficulty in discerning the primer defect.

58. Given the defect's concealment, Plaintiff and Class Members had no knowledge of Defendant's misconduct or omissions until sometime after the date of purchase, and in Plaintiff's situation not until approximately the Winter of 2022.

59. Thus, the statute of limitations as to the claims of Plaintiff and Class Members did not begin to run and has been tolled with respect to the claims alleged in this Complaint and any others that may relate to them.

## CLASS ALLEGATIONS

60. Plaintiff brings this suit on behalf of himself and on behalf of other similarly situated individuals pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2)-(3). Plaintiff, therefore, seeks to represent

---

[24] *See, supra*, n.16.

the following national class (the "Class") and South Carolina Subclass (the "Subclass") (together, the "Classes"):

> **The Class:** All persons in the United States who, within the applicable statute of limitations period, purchased a new or used Nissan-branded vehicle with defective primer.[25]

> **The Subclass:** All South Carolina residents who, within the applicable statute of limitations period, purchased a new or used Nissan-branded vehicle with defective primer.

61. Defendant, its employees or agents; the Court and the Court staff; and any person who asserts a personal injury or wrongful death claim caused by the defect is excluded from the above Classes.

62. Plaintiff does not know the exact number of members in the Classes but believes that the Classes, jointly and respectively, number in hundreds of thousands, if not substantially more. Defendant sells millions of Nissan-branded vehicles each year, including approximately 1.4 million vehicles in 2018 alone and 682,731 last year.

63. The exact number and identifies of the Class Members are unknown at this time and can be ascertained only through discovery. Identification of the Class Members is a matter capable of ministerial determination from Defendant's business records. The Class Members' identities are readily ascertainable from various sources, including Defendant's ownership records and repair facility records maintained by Defendant or its partners or affiliates.

64. Plaintiff is a member of the Classes and brings claims typical of the Classes because Plaintiff—like other Class Members—purchased a Class Vehicle styled, engineered, financed, sold, marketed, distributed, and manufactured by Defendant. Each received less than the full value

---

[25] Hereinafter, members of the above Class and Subclass shall be referred to, collectively, as the "Class Members." Moreover, all Nissan-branded vehicles covered by the Classes' definitions shall be referred to hereinafter as the "Class Vehicles."

of the Class Vehicles due to defective primer and Defendant's uniform omissions and concealment of said defect.

65. Plaintiff and other Class Members, as ordinary reasonable consumers, would not have purchased the Class Vehicles or paid as much to own the Class Vehicles had Defendant not concealed the primer defect, which was unknown to Plaintiff and the Class alike. As such, Plaintiff and the Classes have been damaged by Defendant's pattern of misconduct common to them all and have suffered the same harms arising out of the same misconduct.

66. Were each Class Member to bring his or her own claims in a separate, individual action, such Class Member would be required to prove many of the same facts, seek the same relief, and would rely on the same or substantially similar causes of action.

67. There are several questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual Class members. Common questions in this case include, but are not limited to the following:

a.   Whether Defendant styled, engineered, financed, sold, marketed, distributed, and manufactured the Class Vehicles;

b.   Whether the primer in the Class Vehicles is and/or has been defective;

c.   Whether Defendant made any warranties or representations about the Class Vehicles' primer and/or the durability of said primer;

d.   Whether Defendant knowingly concealed the existence and/or cause of the primer defect;

e.   Whether Defendant continues and/or has continued to manufacture, distribute, market, and/or sell Class Vehicles with the defective primer despite having been aware of said defect;

f.   Whether Defendant breached the implied warranty of merchantability in selling Class Vehicles with defective primer;

g.   Whether Plaintiff and the Class Members are entitled to monetary and/or non-monetary relief, and if so, what type of relief Plaintiff and the Class Members are entitled to;

h.   Whether Defendant was unjustly enriched in retaining monies paid by Plaintiff and the Class Members for defective vehicles;

i.   Whether Plaintiff and the Class Members are entitled to injunctive relief, including but not limited to a corrective advertising campaign by Defendant, an order to repair the defect in the primer of the Class Vehicles, and an order to correct the defect in the primer prior to the sale of future vehicles.

68. Defendant has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

69. Plaintiff is an adequate Class representative because his interests align with those of the Classes, and his interests do not conflict with the interest of other Class Members. Plaintiff is also committed to protect the Classes' interests without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Classes in general.

70. Plaintiff has also retained attorneys with exceptional experience in complex consumer class action litigation, including litigation involving defective vehicles such as the Class Vehicles at issue in this case. Plaintiff's attorneys also have substantial trial experience, individually and collectively. Plaintiff's attorneys are also willing and able to expend the necessary resources in prosecuting this action on a class action basis. Finally, Plaintiff's attorneys do not have any interest adverse to those of other Class Members.

71. Finally, a class action is superior to other means available to Class Members in adjudicating their claims and obtaining relief.

72. The damages suffered by individual Class Members are relatively small compared to the burden and expense of litigating their claims on an individual basis. Consequently, Class Members have relatively less interest in individually controlling the prosecution of separate actions.

73. Not allowing this case to proceed as a class would run the risk of establishing incompatible standards of conduct for Defendant, as multiple individual actions may lead to different and/or conflicting results.

74. Litigating this case as a class in a single forum benefits Defendant and the judicial system as well. For instance, Defendant likely has no interest in defending against several separate, geographically diverse claims. Indeed, it would be burdensome for Defendant to defend against all potential claims in such a manner than it would be to defend against all potential claims in a single forum and proceeding. Similarly, the judicial system likely has no interest in potentially burdening several courts when the claims of a cohesive class can be fairly and efficiently concentrated and managed by one Court.

## FIRST COUNT
### Breach of Implied Warranty of Merchantability

75. Plaintiff realleges and incorporates the factual allegations in all preceding paragraphs as if alleged herein.

76. At all times relevant and material hereto, Defendant styled, engineered, financed, sold, marketed, distributed, and manufactured the Class Vehicles.

77. Defendant impliedly warranted to consumers, including Plaintiff and other Class Members, whether directly or indirectly, that the paint job (inclusive of primer) on the Class Vehicles would not peel prematurely and last for at least 10 to 15 years, or in other words, throughout most of the life of said Class Vehicles.

78. The defective primer on the Class Vehicles deteriorated prematurely, causing the Class Vehicle's paint to peel prematurely, thus causing harm to Class Members' Class Vehicles and thereby reducing the value of the Class Vehicles. As such, Defendant's Class Vehicles were not of merchantable quality and not fit for their ordinary or intended uses—e.g., having a vehicle with a reasonable appearance and preventing rust and/or premature deterioration—when they left Defendant's possession or were otherwise placed into the stream of commerce.

79. The several serious primer defects alleged and described in this Complaint make the Class Vehicles unfit and inappropriate for their ordinary or intended use.

80. As a result, Defendant breached its implied warranty of merchantability by styling, engineering, financing, selling, marketing, distributing, and manufacturing the Class Vehicles with defective primer unfit for its intended use.

81. As a direct and proximate result of this breach, Plaintiff and the Classes have been injured and are thereby entitled to judgment against Defendant.

### SECOND COUNT
**Fraudulent Concealment**

82. Plaintiff realleges and incorporates the factual allegations in all preceding paragraphs as if alleged herein.

83. At all times relevant hereto, Defendant, was in a position of superior knowledge about the defective primer to Plaintiff and the Classes. As such, Defendant was obligated to disclose to Plaintiff and the Classes the true facts and its knowledge concerning the defective primer in the Class Vehicles.

84. The sale of the Class Vehicles with the defective primer to Plaintiff and the Classes created a particular circumstance giving rise to Defendant's obligation and duty to disclose the known defect in the primer of the Class Vehicles.

85. Each time Defendant sold a Class Vehicle, it knew that it would be the only party to the purchase with knowledge that the Class Vehicles were coated with defective primer. The special knowledge created an additional circumstance giving rise to Defendant's obligation to disclose the known defect with the Class Vehicles.

86. When Plaintiff and Class Members purchased their Class Vehicles, Defendant knew that the primer on said vehicles was defective. Defendant nevertheless failed to disclose the defective nature of the primer to Plaintiff and other Class Members.

87. The omissions made by Defendant as to the primer's durability was material to Plaintiff's and Class Members' decision to purchase their Class Vehicles.

88. Through its omissions, Defendant actively concealed a known latent defect and the intrinsic quality of the primer coating its Class Vehicles from Plaintiff and the Classes. Since Plaintiff and the Classes were not apprised of the defective primer's true nature, and since Plaintiff and the Class Members are likely not experts in the chemical composition of the primer on their Class Vehicles, they could not have easily discovered the defect or known that Defendant concealed the defect until it was too late.

89. Defendant was obligated to disclose its special knowledge of the defective primer to Plaintiff and the Classes. However, it failed to do so. As such, Defendant breached its duty to Plaintiff and other Class Members.

90. On information and belief, Defendant intentionally, willfully, and maliciously concealed the defect from Plaintiff and the Classes.

91. At all times relevant hereto, Plaintiff and Class Members reasonably relied on Defendant to disclose any material defects with the Class Vehicles. Had they known of the defect, Plaintiff

and Class Members would have either purchased the Class Vehicles at a substantial discount or would not have purchased the Class Vehicles at all.

92. On information and belief, Defendant continues to conceal the defective nature of the primer coating the Class Vehicles.

93. On information and belief, Defendant fails to remedy the defective primer on the Class Vehicles.

94. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and/or will continue to suffer harm.

95.  Since Defendant's conduct toward Plaintiff and Class Members is/was, on information and belief, intentional, willful, and malicious, and taken with the intent to mislead and defraud, Plaintiff and Class Members are entitled to punitive and exemplary damages.

## THIRD COUNT
### Negligence

96. Plaintiff realleges and incorporates the factual allegations in all preceding paragraphs as if alleged herein.

97. Defendant owed Plaintiff and Class Members a duty to design and manufacture Class Vehicles without defective primer.

98. Defendant also owed a duty to Plaintiff in Class Members to take necessary precautions against permitting the further distribution of Class Vehicles with defective primer after having been aware of the defect.

99. Despite these duties, Defendant has continued to design, manufacture, market, and sell its Class Vehicles with defective primer and has failed to completely remedy said defect, as evidenced in the factual allegations above. Consequently, Defendant has breached its duties to Plaintiff and Class Members.

100.     Defendant's breach caused the primer on the Class Vehicles to deteriorate, leading to Class Vehicles' paint to peel prematurely, thereby diminishing the value of the Class Vehicles and consequently causing Plaintiff and Class Members to pay more than what the Class Vehicles were actually worth.

101. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have sustained and/or will continue to sustain actual damages.

## FOURTH COUNT
### Unjust Enrichment
### (Plead in the Alternative to Breach of Implied Warranty of Merchantability)

102. Plaintiff realleges and incorporates the factual allegations in all preceding paragraphs as if alleged herein.

103. Defendant was aware of the defect in its Class Vehicles when it distributed said vehicles to be sold and when the Class Vehicles were actually sold to Plaintiff and the Classes.

104. Defendant failed to disclose the defect to Plaintiff and the Classes, despite having been aware of the defect, at the time of purchase. Defendant has also failed to otherwise remedy the defect or provide notices of the defect, as evidenced by the aforementioned factual allegations.

105. Given its nondisclosure, Defendant was able to and did in fact charge a higher price for the Class Vehicles than the Class Vehicles were actually worth.

106. In doing so, Defendant unjustly retained monies rightfully belonging to Plaintiff and the Classes.

107. Defendant accepted and retained the non-gratuitous conferred upon it by Plaintiff and Class Members, who, without having knowledge of the defect, paid a higher price for the Class Vehicles.

108. As a result, Plaintiff and Class Members are entitled to payment in the amount that Defendant had been unjustly enriched in the improper retention of monies, plus any interest on such monies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant for the following relief:

1. An order certifying the Classes, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

2. An award to Plaintiff and the Classes of actual, compensatory, and punitive damages;

3. An award to Plaintiff and the Classes of restitution, disgorgement, and injunctive relief as alleged herein;

4. An award of attorneys' fees pursuant to, *inter alia*, the common fund doctrine;

5. Costs of suit;

6. Pre- and post-judgment interest;

7. An award to Plaintiff and the Classes of any and all further relief the Court deems just and proper.

## **JURY REMAND**

Plaintiff, on behalf of himself and the Classes, hereby demands trial by jury on all issues so triable by right.

Respectfully submitted this 8th Day of November, 2023.

**DAVE MAXFIELD, ATTORNEY, LLC**

s/ David A. Maxfield_____
Dave Maxfield, Esq., Fed ID No. 6293
P.O. Box 11865
Columbia, SC 29211
(803) 509-6800
(855) 299-1656 (fax)
dave@consumerlawsc.com


**McDOUGALL LAW FIRM**
J. Olin McDougall, II, Esq., Fed ID 6582
115 Lady's Island Commons
Beaufort, SC 29907
(843) 379-7000
843-379-7007 (fax)
lin@mlf.law


**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq.
(*pro hac vice* forthcoming)
ak@kazlg.com
245 Fischer Ave., Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523